**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
LAURA MULLANEY,

|                                  |                          |
|----------------------------------|--------------------------|
| Plaintiff,                       | Civil Case No: 19-cv-07996 |

-against-

CITY OF NEW YORK,
CITY OF NEW YORK POLICE DEPARTMENT,
PATROLMEN'S BENEVOLENT ASSOCIATION OF THE
CITY OF NEW YORK.,
LIEUTENANT BENJAMIN GOTTLIEB, individually, and in
his official capacity,
SERGEANT KAERON DAVID, individually, and in his
official capacity,
SERGEANT MIGUELE A. AMORESANO, individually, and
in his official capacity,
SERGEANT SEAN M. MONAHAN, individually, and in his
official capacity,
DEPUTY INSPECTOR THEODORE E. FEDEROFF,
individually, and in his official capacity,
SERGEANT DANIEL J. GAGLIARDI, individually, and in
his official capacity,
and CAPTAIN LOURDES SOTO, individually, and in her
official capacity,

**COMPLAINT**

Plaintiff Demands a
Trial by Jury

Defendants.
--------------------------------------------------------X

Plaintiff, LAURA MULLANEY (hereinafter referred to as "Plaintiff" or

"MULLANEY"), by and through Plaintiff's attorneys, DEREK SMITH LAW GROUP, PLLC,

as and for Plaintiff's Complaint in this action against the Defendants, CITY OF NEW YORK,

CITY OF NEW YORK POLICE DEPARTMENT, PATROLMEN'S BENEVOLENT

ASSOCIATION OF THE CITY OF NEW YORK, LIEUTENANT BENJAMIN GOTTLIEB,

SERGEANT MIGUELE A. AMORESANO, SERGEANT SEAN M. MONAHAN, DEPUTY

INSPECTOR THEODORE E. FEDEROFF, SERGEANT DANIEL J. GAGLIARDI,

SERGEANT KERON DAVID, and CAPTAIN LOURDES SOTO (hereinafter collectively referred to as "Defendants"), respectfully alleges as follows upon information and belief:

## NATURE OF THE CLAIMS

1. Plaintiff brings this action, charging that the Defendants violated Plaintiff's rights pursuant to, *inter alia,* Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), 42 U.S.C. §1983, and to remedy violations of the New York State Human Rights Law; New York Executive Law, § 290, *et seq.* ("the Executive Law"); and the Administrative Code of the City of New York 8-107 *et seq.* ("NYCHRL"), based upon the supplemental jurisdiction of this Court pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking declaratory and injunctive relief and damages to redress the injuries that Plaintiff has suffered as a result of, *inter alia*, sex and gender discrimination, together with hostile work environment, sexual harassment, and retaliation by Defendants.

## JURISDICTION AND VENUE

2. Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question under Title VII. The Court also has jurisdiction pursuant 28 U.S.C. §1331, §1343 and pendent jurisdiction thereto.

3. Additionally, this Court has supplemental jurisdiction under the State law causes of action asserted in this action.

4. Plaintiff filed a complaint with the Equal Employment Opportunity Commission on or about April 23, 2019.

5. Plaintiff received a Notice of Right to Sue letter on or about May 31, 2019**.**

6. Plaintiff satisfied all administrative prerequisites and is filing this case within ninety (90) days of receiving the Right to Sue Letter.

7. Venue is proper in this District based upon the fact that the events or omissions which gave rise to the claims asserted herein occurred within the Southern District of New York.


## **PARTIES**

8. Plaintiff LAURA MULLANEY (hereinafter referred to as "Plaintiff" and/or "MULLANEY") is an individual female who is a resident of the State of New York, Queens County.

9. At all times material, Defendant CITY OF NEW YORK (hereinafter referred to as "Defendant CITY" or "CITY") was and still is a municipal entity duly authorized and existing under the laws of the State of New York.

10. At all times material, Defendant CITY maintained the agency City of New York Police Department (hereinafter referred to as "Defendant NYPD" or "NYPD"), as authorized under the laws of the State of New York.

11. At all times material, Defendant CITY was responsible for making the policies of NYPD and was acting under the color of law, to wit, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York.

12. At all times material, Defendants CITY and NYPD (hereinafter collectively referred to as "State Defendants") were joint employers of Plaintiff.

13. At all times relevant to this Complaint, State Defendants meet the definition of an "employer" under all applicable state and local statutes.

14. At all times relevant to this Complaint, Plaintiff was an "employee" of State Defendants within the meaning of the aforementioned statutes.

15. At all times relevant to this Complaint, State Defendants acted by and through their employees, agents, and servants who were acting in the scope and course of employment, agency and servitude.

16. At all times material, Defendant PATROLMEN'S BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK (hereinafter referred to as "Defendant PBA") was, and still is, a domestic not for profit corporation duly authorized and existing under the laws of the State of New York.

17. At all times material, State Defendants' employee SERGEANT MIGUELE A. AMORESANO (hereinafter referred to as "Defendant AMORESANO" and/or "AMORESANO"), is an individual male believed to be a resident of the State of New York. AMORESANO was, and still is, a Sergeant with NYPD and had supervisory authority over Plaintiff with regard to her employment, controlling many aspects of Plaintiff's job duties. AMORESANO held the power to hire and fire Plaintiff.

18. Defendant AMORESANO further had managerial power over Plaintiff and all other similarly situated employees.

19. At all times material, State Defendants' employee SERGEANT SEAN MONAHAN (hereinafter referred to as "Defendant MONAHAN" and/or "MONAHAN") is an individual male believed to be a resident of the State of New York. MONAHAN was, and still is, a Sergeant with NYPD and had supervisory authority over Plaintiff with regard to her employment, controlling many aspects of Plaintiff's job duties. MONAHAN held the power to hire and fire Plaintiff.

20. Defendant MONAHAN further had managerial power over the Plaintiff and all other similarly situated employees.

21. At all times material, State Defendants' employee LIEUTENANT BENJAMIN GOTTLIEB (hereinafter referred to as "Defendant GOTTLIEB" and/or "GOTTLIEB") is an individual male believed to be a resident of the State of New York. GOTTLIEB was, and still is, a Lieutenant with NYPD and had supervisory authority over Plaintiff with regard to her employment, controlling many aspects of Plaintiff's job duties. GOTTLIEB held the power to hire and fire Plaintiff.

22. Defendant GOTTLIEB further had managerial power over the Plaintiff and all other similarly situated employees.

23. At all times State Defendants' employee DEPUTY INSPECTOR THEODORE E. FEDEROFF (hereinafter referred to as "Defendant FEDEROFF" and/or "FEDEROFF") is an individual male believed to be a resident of the State of New York. FEDEROFF was, and still is, a Deputy Inspector with NYPD and had supervisory authority over Plaintiff with regard to her employment, controlling many aspects of Plaintiff's job duties. FEDEROFF held the power to hire and fire Plaintiff.

24. Defendant FEDEROFF further had managerial power over the Plaintiff and all other similarly situated employees.

25. At all times material, State Defendants employee LIEUTENTANT DANIEL J. GAGLIARDI (hereinafter referred to as "Defendant GAGLIARDI" and/or "GAGLIARDI") is an individual male believed to be a resident of the State of New York. GAGLIARDI was a Sergeant with NYPD and had supervisory authority over Plaintiff with regard to her employment, controlling many aspects of Plaintiff's job duties.

26. As Plaintiff's supervisor, GAGLIARDI has also aided and abetted the unlawful conduct described herein.

27. At all times material, State Defendants' employee CAPTAIN LOURDES SOTO (hereinafter referred to as "Defendant SOTO" and/or "SOTO") is an individual female believed to be a resident of the State of New York. SOTO was, and still is, a Captain with NYPD and had supervisory authority over Plaintiff with regard to her employment, controlling many aspects of Plaintiff's job duties.

28. As Plaintiff's supervisor, SOTO has also aided and abetted the unlawful conduct described herein.

## FACTUAL ALLEGATIONS

29. In or around July 2012, Defendant NYPD hired Plaintiff as an Officer.

30. Plaintiff has faithfully and loyally served the citizens of New York City for over seven (7) years. Moreover, Plaintiff left her previous job as an attorney to serve the public through the police force.

31. At all times relevant, Defendants, on at least one occasion, subjected Plaintiff to unwanted physical contact.

32. By way of example, in or around September 2015, GOTTLIEB fixed Plaintiff's collar brass without Plaintiff's consent thereby making unwanted physical contact with Plaintiff. Defendant GOTTLIEB created a hostile work environment on the basis of Plaintiff's gender.

33. GOTTLIEB continued to subject Plaintiff to routine unwelcomed sexual harassment and highly inappropriate sexual comments.

34. By way of example, in or around November 2015, GOTTLIEB stated to Plaintiff, "You can have me any way you want me, Mullaney."

35. By way of further example, in or around October and November 2015, GOTTLIEB stated to Plaintiff, in sum or in substance, that he believed she was dominating in the bedroom and that she probably orders men around with a whip. GOTTLIEB was referring to his opinions about Plaintiff's sexual activities. GOTTLIEB created a hostile work environment on the basis of Plaintiff's gender.

36. GOTTLIEB's comment was made in reference to his belief that Plaintiff was sexually attracted to him. GOTTLIEB created a hostile work environment on the basis of Plaintiff's gender.

37. In or around December 2015, Plaintiff had a mark on her neck. GOTTLIEB repeatedly asked Plaintiff if she received the mark from a sexual encounter. Plaintiff tried to put an end to GOTTLIEB'S repeated inquiries by stating the mark had been made by a vacuum in an attempt to ward off the continuous line of questioning. A male officer arrived at the precinct, and GOTTLIEB then queried, "Is he the vacuum?" Plaintiff was humiliated, embarrassed, and disgusted by this line of questioning. GOTTLIEB created a hostile work environment on the basis of Plaintiff's gender.

38. In or around December 2015, Plaintiff told GOTTLIEB that she did not care for supervisors who cater to female officers solely because the female officer is flirtatious, promiscuous, or subservient. GOTTLIEB understood this to mean that Plaintiff would not fall in line with the accepted behavior of female officers to be subservient to male officers.

39. On or about December 31, 2015, GOTTLIEB and CO CAPT. MICHAEL BAKER (hereinafter referred to as "BAKER"), assigned a female officer a special tour to drive GOTTLIEB and BAKER for her shift.

40. The female officer has also been subjected to GOTTLIEB's inappropriate and offensive behavior, but was not resistant like Plaintiff. Because Plaintiff refused GOTTLIEB's sexual advances, she was told to cover the female officer's assignment, resulting in Plaintiff having to work overtime. However, after seeing Plaintiff's reaction, BAKER did not follow through with the assignment.

41. On or about March 31, 2016, SEARGANT DANIEL GAGLIARDI informed a male officer that Plaintiff would be assigned to be a Field Training Officer (hereinafter referred to as "FTO"). This male officer and Plaintiff had planned on forming a work partnership. Plaintiff learned of this assignment from the officer. SEARGANT GAGLIARDI never attempted to discuss the FTO assignment with Plaintiff.

42. The main requirement to become an FTO was that the officer needed to have at least five (5) years' experience as a police officer. Plaintiff, with a little more than three (3) years' experience as an officer with the NYPD, was neither highly qualified for an assignment to the FTO nor fit the description of someone who should be an FTO.

43. The FTO position was considered undesirable due to the fact that FTOs needed to obtain arrests and summonses for themselves (commonly referred to as "numbers" and "quotas") as well as being pressured to make arrests for the newly-assigned officers they were in charge of. FTOs are responsible for double or triple the amount of work of the average patrol officer and receive no additional compensation from the NYPD.

44. The assignment of Plaintiff to the FTO was in retaliation for Plaintiff's unwillingness to engage in sexual and promiscuous activities with male officers and an effort to advance the already hostile work environment Plaintiff was subjected to by State Defendants.

45. On or about April 2, 2016, GAGLIARDI ordered Plaintiff to sign a notification for FTO training. Plaintiff initially refused to sign the notification, indicating that her refusal was based on the fact that she believed she was unfairly treated and retaliated against because she did not act promiscuously towards her male officers. Plaintiff further noted her lack of experience and the fact that her father was battling cancer as reasons why she should not be assigned as an FTO. Plaintiff requested to have a union representative present to speak on her behalf.

46. Almost immediately, four (4) male supervisors confronted Plaintiff and denied her request to have a union representative present to speak on her behalf. Plaintiff stated to State Defendants' employee LIEUTENANT PAUL BLAKE (hereinafter referred to as "BLAKE"), "Sorry, I put my hands on perps, not bosses," in reference to the fact that female officers who do not conduct themselves in a promiscuous manner with the supervisors receive harsher treatment and punishment within the NYPD.

47. Based on Plaintiff's protected complaint of unfair treatment due to her gender, Defendants imposed a Schedule B Command Discipline (hereinafter referred to as "CD") upon Plaintiff for discourtesy. Further, Defendants told Plaintiff that she was "lucky [she] [wasn't] being suspended."

48. A CD is imposed directly by the subject officer's commanding officer and may vary based on the seriousness of the misconduct, the officer's disciplinary history, and the officer's performance records. The penalties range from an oral warning and admonishment to a forfeiture of up to 10 days of vacation or accrued time.

49. The CD warning was simply a means of further harassing and retaliating against Plaintiff for engaging in protected activity by complaining about the sexual harassment she was being subjected to and refusing to act in a promiscuous way with male officers. A Schedule B CD

for discourtesy is one of the harshest penalties imposed within the NYPD, and precludes Plaintiff from many opportunities within the Department.

50. Supervisors and more experienced officers informed Plaintiff that the CD "would follow [her] everywhere," and that she would not be eligible for any units that exist in the Department, and would have to remain on patrol duty.

51. Despite her complaints, State Defendants and their employees took no corrective action with regards to the hostile work environment that Plaintiff was subjected to.

52. When Plaintiff told GAGLIARDI that she could not trust anyone on the job to complain to, GAGLIARDI told Plaintiff to "**CALL POPPA.[1]**"

53. Defendants created a hostile work environment on the basis of Plaintiff's gender and because Plaintiff complained about discriminatory behavior and engaged in other protected activity.

54. On or about April 12, 2016, Plaintiff was forced to sign the CD warning under duress. Plaintiff's PBA representative threatened Plaintiff that officers would testify against her and that she would receive a harsher punishment if she did not sign the CD. Plaintiff was forced to accept a reprimand because she engaged in protected activity. This was direct retaliation for her complaints of sexual harassment and retaliation while employed with the NYPD. The Defendants imposed a penalty of a forfeiture of four (4) of her ten (10) allotted vacation days for the year despite her father being in failing health. While imposing the penalty, Defendant FEDEROFF, Commanding Officer of the 30 Precinct at the time, stated in sum and substance, "I understand you're going through some personal issues, I don't want to pry, I don't want to pry. Let us know if you need anything."

55. On or about April 30, 2016, Plaintiff was assigned an arrest for the first time in her career as a result of a radio run which was not assigned to her sector. Plaintiff was merely at the scene

---

[1] Police Organization Providing Peer Assistance.

"backing" the unit she was called to help. She was instructed by GAGLIARDI to charge the individual alleged to have committed the crime with a felony charge. Plaintiff knew that she could not substantiate the felony charge, but understood that this was a retaliatory action of their part and, that if she did not comply, she would most likely be suspended. Plaintiff was forced to charge the individual that she arrested with a felony.

56. The first question the Assistant District Attorney (hereinafter referred to as "ADA") asked when reviewing the matter was, "what makes this a felony?" Plaintiff told the ADA that, even though she could not substantiate the charge, her supervisors "had an issue" with her and that "they are making [Plaintiff] charge [the individual] with a felony."

57. Plaintiff's supervisors would not have treated Plaintiff in this matter had she succumbed to their sexual advances or if she was a male.

58. In or around May 2016, Plaintiff was informed that she was being transferred to the midnight platoon. Some supervisors felt that this could be seen as retaliatory and "too much," fearing this action would result in another complaint by Plaintiff. Thus, Plaintiff was ultimately not transferred.

59. The senior male supervisors were guarding each other and trying to avoid further investigation into the retaliation and discrimination to which they were subjecting Plaintiff.

60. On or about July 8, 2016, a female officer was openly and visibly discourteous to GAGLIARDI and refused her assignment. GAGLIARDI did not take any corrective action against this female officer. On or about July 21, 2016, a male officer was absent without leave ("AWOL") and no corrective action was taken. In or around July 2016, GAGLIARDI stated to a male officer that he regretted issuing the CD for discourtesy to Plaintiff on April 2, 2016.

in light of the fact that no corrective action was taken against the other two officers for similar offenses.

61. In or around October 2016, State Defendants informed Plaintiff that NYPD's Employee Assistance Unit (hereinafter referred to as "EAU") received a complaint about her. Plaintiff went to NYPD's EAU on October 11, 2016, where DETECTIVE RAUL RODRIGUEZ (hereinafter referred to as "RODRIGUEZ") stated two anonymous calls were made complaining that Plaintiff was a "HAIR-BAG."

62. RODRIGUEZ also informed Plaintiff that he believed that she was sent to EAU because officers are under the impression that "[EAU] take guns" away from officers, meaning that Plaintiff was sent to this unit with the hope that she would be stripped of her gun and shield, a process referred to as being modified, or modified duty. Plaintiff was sent to EAU because supervisors believed that she may have her gun taken away, and thus, her responsibilities. This was one of the retaliatory scare tactics used by Defendants when officers did not fall in line with accepted behavior, used in an effort to scare an officer into complying with a supervisor's demands.

63. In or around October 2016, GOTTLIEB repeatedly ordered Plaintiff to a shooting post in the 32nd Precinct as well as a robbery post in Central Park Precinct. This latter post lasted until 2:05 a.m., despite GOTTLIEB's knowledge that Plaintiff took the subway home alone after her shift. GOTTLIEB assigned Plaintiff to this post in retaliation for her having engaged in protected activity. GOTTLIEB called into the command station on his day off to ensure that Plaintiff was given these retaliatory assignments.

63. GOTTLIEB deliberately treated Plaintiff differently than her male counterparts, because of her refusal to succumb to his sexual advances and because of her having engaged in protected

activity by complaining about the sexual harassment, unwanted sexual advances, and discriminatory behavior State Defendants and their employees subjected her to on the basis of her gender.

64. In or around November 2016, Plaintiff's father was admitted into the hospital with a fever. Plaintiff learned that her father's lymphoma had metastasized to his brain on December 7, 2016. Plaintiff's father succumbed to his illness on December 21, 2016.

65. When an officer is unable to work, other officers can donate time such that the needy officer does not incur negative leave time. Several of Plaintiff's colleagues wanted to donate their time to Plaintiff so that she would not have any negative leave time.

66. State Defendants denied each and every one of these requests for donation, in retaliation for Plaintiff's complaints of harassment, and because of Plaintiff's gender. Plaintiff's accrued time ran out on December 19, 2016. Plaintiff was told she was on a precinct assignment to New York Hospital Cornell Weill on December 20, 2019. Approximately one month later, the Assistant Integrity Control Officer requested plaintiff submit what is referred to as a "28" (request for leave) for December 20, 2019, the last day she saw her father alive. Plaintiff contacted the EAU which intervened in the matter. In the beginning of January 2017, Plaintiff returned to work after her father's death.

67. Shortly after returning, Plaintiff submitted a request to be reassigned from the 30th Precinct.

68. In or around February 2017, State Defendants' Assistant Integrity Control Officer (hereinafter referred to as "ICO"), YARISSA RODRIGUEZ, called Plaintiff into her office and stated, "I need to know if there is going to be a fight" in the locker room. Plaintiff, puzzled at the odd question, requested clarification. Plaintiff eventually learned that Officer CHRISTINE WINTER (hereinafter referred to as "WINTER"), a close confidante of AMORESANO,

stated that Plaintiff was banging on her locker door and attempting to hit WINTER with the locker door. Plaintiff informed the ICO that the locker handle was broken and that she had to hit the door so that a certain piece would descend so that she could fit the lock through the handle. Plaintiff explained she had been doing this for the past year. In a rather humiliating display, RODRIGUEZ inspected Plaintiff's locker along with a male officer who confirmed that the locker was indeed broken. Plaintiff was present at this time in the female officer's locker room.

69. WINTER and AMORESANO, working together in an unlawful, tortious combination, deliberately and intentionally sabotaged Plaintiff's professional reputation and interfered, and continue to interfere, with Plaintiff's contractual rights and interests because of her gender and because she continued to complain about the unlawful discrimination and harassment she was being subjected to.

70. Plaintiff told the Integrity Control Officer that she would be willing to go to a hearing and discuss the incident on the record to clear her name. She further stated that, if individuals were making such allegations, she would submit to an examination by a Department mental health professional at their headquarters in Lefrak City. RODRIGUEZ declined both of Plaintiff's offers.

71. WINTER submitted the false complaint about Plaintiff at the direction of AMORESANO, who was retaliating against Plaintiff for her complaints of sexual harassment and retaliation and because of her gender.

72. WINTER's false complaint and AMORESANO's directions regarding the same were all in retaliation for Plaintiff's complaints of harassment and discrimination.

73. In or around February 2017, Plaintiff could no longer remain at the 30th Precinct due to the retaliation and discrimination she was subjected to.

74. RODRIGUEZ informed her that the only way she could be removed from the precinct was to go to a detail referred to as the 125 Street Task Force.

75. Defendants offered Plaintiff a foot post at 125th Street and Lexington Avenue. The foot post at 125 and Lexington is notorious for homeless people and drug users, and widely recognized as one of the most dangerous assignments in the NYPD due to the contact with mentally ill substance abusers.

76. In December 2016, GOTTLIEB was transferred from the 30th Precinct to the Patrol Borough of Manhattan North. The 125th Street Task Force was a unit in the Patrol Borough of Manhattan North. Plaintiff voiced her concerns about this to RODRIGUEZ who assured Plaintiff this should not be problematic.

77. RODRIGUEZ repeatedly assured Plaintiff that she would not be transferred until after the 2017 Sergeant's examination Plaintiff was scheduled to take. Plaintiff was transferred two days before the examination. Around this time, Defendants began a campaign to paint Plaintiff as a bad performer and/or force the Plaintiff out of the NYPD.

79. On or about February 20, 2017, Plaintiff arrived at 125 Street Task Force. While Plaintiff was walking into the building with a box of belongings in hand, NYPD employee LIEUTENANT LAWRENCE DONNELLY (hereinafter referred to as "DONNELLY") asked Plaintiff, "you know Gottlieb?" Plaintiff learned DONNELLY was a friend and former co-worker of GOTTLIEB.

80. This inquiry was a statement calculated to put Plaintiff on notice that she would not escape the retaliatory and discriminatory behavior she experienced by GOTTLIEB and her other supervisors at 30th Precinct.

81. Just as Plaintiff started at the new precinct, she was subjected to a hostile work environment based on her complaints of sexual harassment and discrimination and because of her gender.

82. On or about February 28, 2017, SERGEANT KAERON DAVID (hereinafter referred to as "DAVID") assigned Plaintiff to be his driver. At some point thereafter, Plaintiff complained to DAVID about how women are treated in the department.

83. In response, DAVID stated, "pretty girls don't push sector charlie—it's just the way it is, get over it." DAVID was referring to the fact that attractive female officers who are subservient are given preferential assignments and are not expected to engage in substantial police work. DAVID asked Plaintiff out for drinks and one occasion told her he "missed" her.

84. In or around March 2017, Plaintiff and DAVID encountered an individual, ANTHONY RAINEY (hereinafter referred to as "RAINEY"), who is frequently arrested for possession of drugs.

85. RAINEY had been arrested for selling narcotics on March 1, 2017. On or about March 15, 2017, Plaintiff was driving DAVID, who stated that RAINEY had taken his pants off while in the holding cells. When plaintiff asked why that occurred, DAVID stated he wanted to "show off that he had a big dick." Shortly after his conversation, Plaintiff and DAVID saw RAINEY on the street.

86. DAVID commanded RAINEY to expose himself to Plaintiff.

87. RAINEY duly complied with DAVID's commands and removed his bare penis from his pants such that is was visible to Plaintiff and DAVID.

88. At the same time, DAVID moved his face within inches of Plaintiff's face and whispered into Plaintiff's ear, "Look at it!" directing Plaintiff to look at RAINEY's penis.

89. Plaintiff looked away in disgust to try and avoid seeing RAINEY'S penis.

90. Plaintiff was in shock, embarrassed, and humiliated that DAVID would command a criminal to expose himself to Plaintiff without her consent, request, or invitation.

91. DAVID would never have done this if Plaintiff was a male or if Plaintiff was a female officer who was more promiscuous or more likely to succumb to sexual advances.

92. Defendants created a hostile work environment on the basis of Plaintiff's gender, her unwillingness to act in a sexual manner with her supervisors, and for engaging in protected activity by complaining about Defendants' discrimination and retaliation.

93. In or around March 2017, while Plaintiff was driving DAVID, she was subjected to an unwelcome and unwanted barrage of questioning about her sexual relationships. DAVID was trying to pressure Plaintiff into revealing information about her sex and dating life. These unwelcome comments of a sexual nature had the purpose and effect of unreasonably interfering with Plaintiff's work environment.

94. DAVID stated that other officers told him that Plaintiff "looks like a model." He further stated that the one complaint he had about her appearance was that her hair was "too long." DAVID subjected Plaintiff to a hostile work environment on the basis of her gender.

95. In March 2017, Plaintiff stated to DAVID that she preferred not driving supervisors.

96. In or around April 2017, Plaintiff made an arrest for criminal trespass of a McDonald's restaurant. DAVID commanded Plaintiff to exaggerate the facts of the arrest in the report in order to manufacture a charge for Assault in the Third Degree against the trespasser. Plaintiff feared that she would be subject to further retaliation if she did not comply.

97. While faxing paperwork to the ADA's office behind the desk of the 25 Precinct, DAVID commented that he could see Plaintiff's back tattoo as the back of Plaintiff's work shirt had ridden up. Immediately after making this statement, DAVID said "it's you and me tomorrow," as an indication that Plaintiff would be his driver the next work day.

98. Plaintiff was forthcoming with the Assistant District Attorney, who stated the case would most likely be declined to prosecute.

99. Plaintiff explained the circumstances to DAVID who then began to explain to the plaintiff the definition of assault. Plaintiff responded, "I just want to get the body out of the cells." DAVID immediately flew into a rage after Plaintiff made this statement. He became belligerent, threw papers at Plaintiff, slammed cell doors, and screamed at Plaintiff in front of the individual she arrested. DAVID's tantrum was so violent and his movements so erratic that his bangle bracelet flew off his wrist. Plaintiff was scared for her safety and feared that DAVID would harm her physically.

100. Eventually, the arrest was determined to have been properly charged for criminal trespass, the same charge that Plaintiff wanted to make but was forced not to do so by DAVID.

101. DAVID never used this type of force or tone with a male officer. He created a hostile work environment on the basis of Plaintiff's gender, her unwillingness to act in a sexual manner with her supervisors, and for engaging in protected activity by complaining about discrimination and retaliation.

102. On or about May 10, 2017, DONNELLY ordered Plaintiff to arrest a mentally unstable individual for smoking an illegal synthetic substance, "K2." This individual was rejected by Emergency Medical Services ("EMS") due to mental health concerns.

103. Shockingly, after being rejected by EMS due to his mental condition, Defendants left Plaintiff alone with this mentally unstable individual. The individual began deliberately bashing his head violently into a wall. Three (3) officers were needed to subdue him. Plaintiff was injured in the process with red markings on the side of her face. Plaintiff would not have been left alone with the individual if she had not complained about sexual harassment and if she was a male. Defendants purposely tried to put Plaintiff in harm's way to scare her into resigning from employment.

104. The very next day after this incident, Plaintiff asked to be removed from the 125th Street Task Force because of the discrimination, harassment, hostile work environment, and retaliation she was being subjected to be Defendants.

105. In or around June 2017, GOTTLIEB and DONNELLY deliberately placed Plaintiff on the rookie roster for the 25th Precinct to cover the Governor's Ball, despite the fact that Plaintiff was not a member of the 25th Precinct and that there was a demarcation in overtime assignments between the 25th Precinct and the 125 Street Task Force. During the shift, Plaintiff was placed in the middle of a bridge without backup, even though there was a terrorist attack on a bridge in London the week prior.

106. On or about July 11, 2017, Plaintiff was ordered to report to the 30th Precinct. There, Plaintiff was placed on the graveyard shift.

107. On or about July 17, 2017, Plaintiff was not scheduled to report in for work. At, approximately 12:30 A.M., a Sergeant and a police officer from the 114th Precinct forced their way into Plaintiff's home, because GOTTLIEB alleged she did not report to duty.

108. The Sergeant kicked in Plaintiff's apartment door and entered the apartment with his gun drawn, and was seconds away from discharging his weapon and shooting Plaintiff when they

entered her apartment. This incident was especially harrowing for Plaintiff and caused her to have extreme stress, anxiety, nightmares, and caused her to fear for her personal safety. Further, the Sergeant, while standing in plaintiff's living room, ordered Plaintiff to produce her work identification. When Plaintiff proceeded to retrieve this item from a nearby bag, the Sergeant menacingly cautioned, "Watch it, watch it!"

109. Plaintiff was not scheduled to work on July 17, 2017. GOTTLIEB was aware that Plaintiff was not scheduled to report to work that day. By ordering the officers to go to Plaintiff's home, GOTTLIEB intended to scare Plaintiff in direct retaliation for Plaintiff's complaints to GOTTLIEB.

110. The 114th Precinct broke into Plaintiff's home as a direct result of GOTTLIEB's deliberate misrepresentation that she was AWOL. GOTTLIEB discriminated and created a hostile work environment for Plaintiff on the basis of of her gender and because she complained of Defendants' unlawful harassment and discrimination.

111. GOTTLIEB's misrepresentation that Plaintiff was AWOL was deliberate and designed to trigger the subsequent forced entry by the 114th Precinct.

112. Approximately one (1) week after this incident, FEDEROFF promoted GOTTLIEB to Plaintiff's permanent platoon commander. GOTTLIEB did not want to work the graveyard shift. The platoon commander was ordered to leave the midnight platoon, which was his preference.

113. In or around July 2017, Plaintiff went to the 114th Precinct to request reimbursement due to her damaged apartment door and wall that occurred as a result of the break in or about July 17, 2017. Personnel from the 114th Precinct reported the matter to Internal Affairs Bureau.

114. In the 30th Precinct, Plaintiff was forced into the role of FTO, despite her career being derailed. In retaliation for her complaints of discrimination, sexual harassment, and retaliation, Plaintiff was forced to work with inexperienced officers thereby putting their lives, her life, and the general public's safety in jeopardy.

115. In or around August 2017, Plaintiff filed a retaliation claim with NYPD's Office of Equal Employment Opportunity ("OEEO"), specifically citing her frequent midnight assignments, the incident involving 114th Precinct breaking into her home, and the FTO duties she did not have enough experience to maintain.

116. In or around October 2017, Plaintiff notified her immediate supervisor MONAHAN that she was not sleeping well and didn't feel comfortable going out with brand new officers every night because she did not think it was safe for her, the officers, or the public.

117. In or around November 2017, the 30th Precinct argued that Plaintiff was not second in line in regards to choosing vacation time. The proffered reason was that Plaintiff's list number is not "1322.5" but "13,225." This proffered reason is entirely false.

118. An officer was instructed by MONAHAN to pick his vacation time before Plaintiff. He chose not to pick first, because he knew Plaintiff was more senior and should choose before him. Eventually, State Defendants conceded that Plaintiff was in fact more senior and should choose first. Defendants discriminated against Plaintiff because of her gender and retaliated against Plaintiff because she engaged in protected activity by skipping over her in choosing vacation days, resulting in an adverse employment action.

119. In or around December 2017, GOTTLIEB denied Plaintiff a partnership with another officer who requested to work with her in retaliation for Plaintiff's complaints, and because Plaintiff refused to act promiscuously towards GOTTLIEB.

120. For the third quarterly evaluation of 2017, MONAHAN provided Plaintiff a rating of 36, which falls under the "exceed standards" categorization. On or around December 27, 2017, GOTTLIEB rejected this rating, stating: "It is the undersigned's belief that PO Mullaney has not meet the expectations and standers of patrol. She often lacks any self-initiated activity. PO Mullaney has difficulty working with others and has poor interactions with her peers, her supervisors, and the public at large. PO Mullaney has also demonstrated a lack of tactical and situational awareness." (*sic*).

121. In or around January 2018, GOTTLIEB and MONAHAN re-assigned Plaintiff's arrest to the male rookie with whom she was working, making her an assistant in her own arrest. This was done in spite of GOTTLIEB'S critique that Plaintiff lacks self-initiated activity.

122. Defendants' friends and colleagues began actively targeting Plaintiff by illegally utilizing NYPD procedures and false representations to, *inter alia,* discredit her, sabotage her career as a police officer, defame her reputation as a police officer, damage her financially, and otherwise retaliate against her for having engaged in protected activity.

123. GOTTLIEB's evaluation was pretextual for the above-outlined purposes in retaliation against Plaintiff. GOTTLIEB discriminated against Plaintiff on the basis of her gender and because she engaged in protected activity.

124. MONAHAN followed suit, adopting GOTTLIEB'S position and conspiring in retaliation by giving the Plaintiff a rating of 23 on her next evaluation, Quarter 4 of 2017, and not providing any reasoning for the sharp decline in Plaintiff's rating. Plaintiff's low rating placed her in the "needs improvement" category, despite her continuing to be assigned FTO duties and producing consistent activity/quotas. This rating was an extraordinary deviation from Plaintiff's previous yearly evaluations where she was rated as an above average police officer.

125. MONAHAN wrote the following, parroting GOTTLIEB'S tirade: "PO Mullaney has difficulty working with and interacting with most members of the Department including her peers and supervisors. PO Mullaney frequently expresses signs of intense exasperation and displeasure when interacting with most members of the public. PO Mullaney lacks motivation to go above and beyond the bare minimum in most aspects of police work. Overall, PO Mullaney has a poor attitude in regards to a significant portion of her daily tasks and duties as well as the Department as whole." The decline of the rating of 36 to 23 occurred approximately three (3) months later.

126. On or about January 16, 2018, Plaintiff filed another complaint of retaliation with OEEO. That same evening, GOTTLIEB appeared extremely agitated.

127. On or about January 18, 2018, GOTTLIEB brought his AR-15 semi-automatic rifle into the Precinct. GOTTLIEB left out the front of the Precinct. As GOTTLIEB was leaving the building, he placed the AR-15 in his right hand and looked directly at Plaintiff while smiling. Plaintiff had never seen LT. GOTTLIEB carry such a menacing weapon into the Precinct. GOTTLIEB brought this rifle into work to intimidate Plaintiff and further perpetuate the already-existing hostile work environment based on her gender and her complaints. Plaintiff was scared for her safety because of the dangerous nature of the weapon as well as GOTTLIEB's general aggressive demeanor.

128. In or around in November 2017, Plaintiff realized the Department was attempting to stonewall the investigation into the unauthorized entry into Plaintiff's home due to GOTTLIEB's claim that Plaintiff was AWOL. The department repeatedly ignored plaintiff's requests for information or provided her with misinformation.

129. On January 26, 2018, Plaintiff submitted to a hearing regarding the July 17, 2017, incident concerning the 114th Precinct where officers entered her home without authorization. This hearing took place over six (6) months after the incident. During the hearing, Plaintiff was accused of not identifying herself in her own home, and was asked to concede that the paint on her door was old and, therefore, more likely to chip when the Sergeant kicked it. The three (3) supervisors conducting the hearing intimated that Plaintiff could not state the Sergeant kicked in the door because she was on the other side of the door. One supervisor, in response to Plaintiff's counsel noting that the Sergeant simply left without even so much as an apology, condescendingly asked, in sum and substance, "Would it have made you feel better if he said he was sorry, Officer Mullaney?"

130. This individual even read the initial report made to IAB by 114th Precinct personnel where Plaintiff was falsely portrayed as belligerent and delusional. This was a deliberate attempt by the questioner to rattle Plaintiff during her testimony.

131. Defendants' investigation was conducted in bad faith, as the department argued exigent circumstances were the reason of them breaking into her home. Further, the department tried to force Plaintiff to agree that the Sergeant was acting in good faith.

132. Shortly thereafter, as Plaintiff walked into the door of the 30th Precinct after returning from the hostile encounter at the 114th Precinct, Defendants informed Plaintiff that she would be issued two (2) Command Disciplines for events that occurred on November 16, 2017. MONAHAN and GOTTLIEB issued two separate Command Disciplines for "failure to safeguard" and "going out by [herself]" and sought to dock Plaintiff four (4) days of vacation time. The two CDs were combined into one, and Plaintiff was subsequently docked one (1) vacation day. Plaintiff was threatened into signing the CD even though she did not agree with

its contents. Plaintiff consented to the witch-hunt penalty because she knew she would receive a harsher penalty if she proceeded to a departmental trial. Defendants created a hostile work environment on the basis of Plaintiff's gender, her unwillingness to act in a sexual manner with her supervisors, and for complaining about discrimination and retaliation.

133. In or around February 2018, Plaintiff appealed the 23/50 on her quarterly evaluation and a "needs improvement" rating from MONAHAN.

134. On or about March 9, 2018, SOTO upheld Plaintiff's evaluation. Defendants created a hostile work environment on the basis of Plaintiff's gender, her unwillingness to act in a sexual manner with her supervisors, and for complaining about discrimination and retaliation.

135. By way of example, SOTO stated that Plaintiff did not help a new officer who was given her arrest, Plaintiff did not want to be an "FTO," Plaintiff did not initially sign the notification for FTO training,[2] and that Plaintiff did not mentor new officers enough.[3] SOTO also insinuated in her evaluation that Plaintiff should be terminated from her role as an officer.

136. Later that evening, distraught about the evaluation she was given, Plaintiff called out of work sick because she was too emotionally distressed to return to work.

137. On or about March 11, 2018, after Plaintiff returned to work, officers informed her that GOTTLIEB placed her on a foot post in retaliation for her calling out sick, and if she "rolled [her] eyes or sucked [her] teeth, [she] would receive a cd for insubordination." Defendants created a hostile work environment on the basis of Plaintiff's gender, her unwillingness to act in a sexual manner with her supervisors, and for complaining about discrimination and retaliation.

---

[2] This occurred two years prior and therefore should not have been mentioned in her evaluation.
[3] Notably, Plaintiff is not an FTO.

138. On or about March 26, 2018, Plaintiff was placed on a solo post next to a building recently incinerated in a 5-alarm fire. That fire killed a friend of Plaintiff, and Plaintiff was extremely emotionally distressed to be there in front of the building where her friend perished. Defendants purposely put Plaintiff to work at this post because of her gender, in order to harass her, and because she engaged in protected activity.

139. After about three (3) hours, Plaintiff began to feel nauseous and developed a pounding headache from breathing in fumes from the 5-alarm fire. Plaintiff was immediately rushed to the hospital. Notably, three (3) officers more junior than Plaintiff were assigned to the fire detail and given motor vehicles to sit in while watching the Post. Plaintiff was not given a motor vehicle. Defendants discriminated against Plaintiff because she is a woman, created a hostile work environment on the basis of her gender, and further retaliated against her for engaging in protected activity.

140. In or around April 2018, MONAHAN completed Plaintiff's Quarter 1 and Quarter 2 of 2017 evaluations, despite the fact that the Plaintiff was not assigned to the 30th Precinct at the time, and despite the fact that MONAHAN was not her supervisor at the time. These evaluations were conducted approximately one year later.

141. Plaintiff received a rating of 24 for her first Quarter of 2017 evaluation with MONAHAN commenting: "PO Mullaney was temporarily assigned to the 125th Street Task Force for Q1 of 2017 within the confines of the 25th Precinct. This evaluation was prepared by the rater after conferral with PO Mullaney's immediate supervisor, Sgt, Kaeron David Tax #917069, on March 30, 2018, at approximately 1025 hours. Sgt. David noted that PO Mullaney would frequently abandon her assigned partner while on foot patrol."

142. Plaintiff received a rating of 24 for the second Quarter of 2017, with MONAHAN noting the following: "PO Mullaney was temporarily assigned to the 125th Street Task Force for Q1 of 2017 within the confines of the 25th Precinct. This evaluation was prepared by the rater after conferral with PO Mullaney's immediate supervisor, Sgt, Kaeron David Tax #917069, on March 30, 2018, at approximately 1025 hours. Sgt. David noted that PO Mullaney did fail to respond to a 10-85 located approximately (1) block from her post."

143. Plaintiff was given low evaluations by the 30th Precinct for a time period when she was not even present there. Further, these evaluations were completed nearly a year after she worked at that Precinct. These were unsubstantiated, bald-faced lies leveled at the Plaintiff in retaliation for her complaints. Defendants failed to cite names, dates, or any other substantial facts supporting these concocted allegations. Defendants discriminated against Plaintiff because she is a woman, because she rejected sexual advances, created a hostile work environment on the basis of her gender, and further retaliated against her for engaging in protected activity.

144. MONAHAN gave Plaintiff a rating of 24 in her Quarter 1 Evaluation of 2018, which falls under the category of "needs improvement."

145. In or around June 2018, Plaintiff met with SOTO concerning four (4) negative evaluations she had received (Q1, Q2, and Q4 of 2017; Q1 of 2018). Plaintiff noted to SOTO that her supervisors acted inappropriately. In the months immediately leading up to this, several supervisors openly accused Plaintiff of writing an anonymous complaint concerning a female officer who had allegedly appeared for her shift intoxicated who was sent home by supervisors half-way through her tour. Plaintiff was accused of this conduct, because she had filed with the OEEO, and became known as a "letter writer." When SOTO brought up

Plaintiff's avoidance of supervisory contact, Plaintiff noted the misconduct of the supervisors, referencing the accusation she was the author of the anonymous letter. SOTO immediately asked Plaintiff, "**Well, did you [submit it]**?"

146. On or about August 8, 2018, Plaintiff was the only member of a midnight platoon to have her tour changed to work a concert in Crown Heights. Despite having seniority over others in the midnight platoon, Plaintiff's tour was changed to work the concert.

147. This assignment was highly unusual and was, in fact, another instance in Defendants' campaign of retaliation against Plaintiff due to her complaints of discrimination.

148. Defendants created a hostile work environment on the basis of Plaintiff's gender, her unwillingness to act in a sexual manner with her supervisors, and for complaining about discrimination and retaliation.

149. On or about September 3, 2018, during a busy Labor Day weekend, Plaintiff was placed on a demanding and excruciating foot post while less senior members of detail were provided with police vehicles. Defendants discriminated against Plaintiff on the basis of her gender and because she engaged in protected activity.

150. On or about September 13, 2018, Plaintiff was instructed by Lieutenant Prendergast (hereinafter referred to as "Prendergast") that her evaluations would remain the same. She offered Plaintiff a transfer to Central Park Precinct, despite Plaintiff requesting to be moved out of the Manhattan borough to a precinct located in either East New York, Brownsville, or Bedford Stuyvesant. Central Park Precinct is a notorious "dumping ground" for officers the department feels are problematic. Prendergast informed Plaintiff that she would not be able to leave the borough of Manhattan North and that the only way she could get out of the 30th Precinct would be to transfer to Central Park Precinct.

151. In or around October 2018, in response to being accused of sexually harassing a new female officer, GOTTLIEB stated, "**Mullaney filed a complaint saying I harass all the new females!**" GOTTLIEB's statement was made in reference to Plaintiff's OEEO complaint. GOTTLIEB's statement was made in the presence of supervisors and police officers. GOTTLIEB discriminated against Plaintiff because of her gender, created a hostile work environment on the basis of her gender, and further retaliated against her for engaging in protected activity. More particularly, this retaliation would prevent a reasonable employee from making the same claims in the future.

152. On or about November 7, 2018, Plaintiff was transferred to the Central Park Precinct. In reference to her transfer, GOTTLIEB told several officers that he "got rid" of Plaintiff.

153. At the time of her transfer, Plaintiff was entitled to select her vacation pick in the 30th Precinct, where she was second in line. At Central Park Precinct, she was placed in a squad where she was last in line to choose vacation days.

154. In or around January 2019, Defendants removed GOTTLIEB'S commentary, which served as the catalyst for the negative evaluations. The comment, "It is the undersigned's belief that PO Mullaney has not meet the expectations and standers of patrol. She often lacks any self-initiated activity. PO Mullaney has difficulty working with others and has poor interactions with her peers, her supervisors, and the public at large. PO Mullaney has also demonstrated a lack of tactical and situational awareness," no longer appears in Plaintiff's Quarterly 3 Evaluation for 2017.

155. In or around January 2019, the "36" rating that was initially rejected by GOTTLIEB was reduced to an "18." SOTO approved this rating.

156. In or around July 2019, Plaintiff was given a "66" for her yearly evaluations in the 30th Precinct. This rating falls under the category of "needs improvement." These evaluations are part of Plaintiff's permanent records.

157. There is currently an ongoing attempt to paint Plaintiff as a bad performer and/or force Plaintiff out of the NYPD. The NYPD and its officers were complicit in the destruction of Plaintiff's career with the NYPD by creating a hostile work environment on the basis of her gender, her unwillingness to act in a sexual manner with her supervisors, and for complaining about discrimination and retaliation.

158. Defendant's internal EEO office was deliberately indifferent and/or negligent towards Plaintiff's protected complaints based on sexual harassment, hostile work environment, and retaliation.

159. State Defendants at all times failed to take corrective action to alleviate the discrimination, hostile work environment, retaliation, and *quid pro quo* nature of the workplace that Plaintiff was subjected to.

160. On an ongoing and continuing basis, Plaintiff has been and continues to be subjected to wrongful, law-violating, punitive acts in a continuous campaign of harassment and vilification by NYPD and the individual Defendants.

161. To further the unlawful, hostile, and intimidating work environment and the disparate treatment of Plaintiff, Defendant GOTTLIEB engaged in additional wrongful acts to create an atmosphere of intimidation to buttress and further Defendants' disparate treatment of Plaintiff, to interfere with her employment contract with the NYPD, and/or to tortuously force Plaintiff out of her employment agreement with the NYPD.

162. Defendants devised, implemented, and executed a scheme through which they gave disparate, preferential treatment to certain employees, while those Defendants knowingly and intentionally denied equal treatment and benefits to others, including Plaintiff.

163. Defendants discriminated against Plaintiff on the basis of Plaintiff's gender, and because Plaintiff complained of or opposed the unlawful conduct of Defendants related to the above protected classes.

164. The above are just some examples of the unlawful discrimination and retaliation to which Defendants subjected Plaintiff.

165. Plaintiff claims a continuous practice of discrimination and makes all claims herein under the continuing violations doctrine.

166. As a result of Defendants' unlawful and discriminatory actions, Plaintiff has endured unlawful humiliation resulting in extreme emotional distress, severe depression, severe anxiety, mental anguish, and physical ailments.

167. As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

168. As a result of Defendants' unlawful and discriminatory actions, Plaintiff has endured irreparable damage to Plaintiff's professional reputation.

169. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation, which such employment entails. Plaintiff has also suffered pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

170. As Defendants' actions were malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages against Defendants, jointly and severally.

**AS A FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER TITLE VII**
**(AS AGAINST THE STATE DEFENDANTS)**

171. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

172. Title VII states in relevant part as follows:

(a) Employer practices: It shall be an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

173. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief based upon the unlawful employment practices of the above-named NYU. Plaintiff complains of NYU's violations of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex/gender.

174. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et seq.*, by subjecting Plaintiff to discrimination on the basis of Plaintiff's sex/gender, together with causing a hostile work environment based on the same.

175. Defendants CITY and NYPD engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e et seq., by harassing and otherwise discriminating against Plaintiff as set forth herein.

176. Defendants CITY and NYPD violated the above and Plaintiff suffered numerous damages as a result.

**AS A SECOND CAUSE OF ACTION
FOR RETALIATION UNDER TITLE VII
(AS AGAINST THE STATE DEFENDANTS)**

177. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

178. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

179. Defendants CITY and NYPD engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e *et seq.* by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of Plaintiff's opposition to the unlawful employment practices of Defendants.

180. Defendants CITY and NYPD violated the above and Plaintiff suffered numerous damages as a result.

### AS A THIRD CAUSE OF ACTION
### FOR MONELL VIOLATION UNDER 42 U.S.C. §1983
### (AS AGAINST THE STATE DEFENDANTS)

181. Plaintiff repeats, reiterates and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

182. Defendants, individually and collectively, while acting under color of state law, engaged in conduct that constituted a procedure, custom, usage, practice, rule and/or regulation of the municipal authority CITY that violates the Constitution of the United States.

183. In addition, the NYPD engaged in a practice policy or custom of inadequate screening, hiring, investigation, retaining, training and supervision of its employees that was the moving force behind the violation of the Plaintiff's rights as described in this Complaint. By reason of the failure of CITY to properly recruit, screen, train discipline and supervise its officers, including the individual Defendants.

184. That the State Defendants have tacitly ratified and authorized the conduct complained of, and has displayed deliberate indifference to the acts and conduct complained of herein.

185. That State Defendants through a policy, practice or custom, directly caused the constitutional violations suffered by the plaintiff.

186. The foregoing customs, policies usages, practices, procedures and rules of the State Defendants' constituted deliberate indifference to the safety, well-being, and constitutional rights of the Plaintiff.

187. That State Defendants' failure to act resulted in a violation of the Plaintiff's constitutional rights

188. At all times material to this complaint, State Defendants had *de facto* policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

189. At all times material to this Complaint, State Defendants failed to properly train, screen, supervise, or discipline employees and police officers, and failed to inform the individual Defendants' supervisors of their need to train, screen, supervise or discipline the individually named Defendants. The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

190. All of the foregoing acts by State Defendants deprived Plaintiff of federally protected constitutional rights.

191. As a result of the foregoing, Plaintiff suffered emotional injury, pain and suffering, great humiliation, costs and expenses, and was otherwise damaged and injured.

**AS A FOURTH CAUSE OF ACTION
FOR DISCRIMINATION UNDER STATE LAW
(AGAINST ALL DEFENDANTS)**

192. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

193. New York State Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, [Effective January 19, 2016: familial status,] marital status, or domestic

violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

194. Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of Plaintiff's sex/gender, as well as creating a hostile work environment.

195. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York State Executive Law Section 296 including sex/gender.

196. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A FIFTH CAUSE OF ACTION
## FOR RETALIATION UNDER STATE LAW
## (AGAINST ALL DEFENDANTS)

197. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

198. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

199. Defendants engaged in an unlawful discriminatory practice by retaliating and otherwise discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of Plaintiff's opposition to the unlawful practices of Defendants.

200. Plaintiff makes a claim against Defendants under all of the applicable paragraphs of New York State Executive Law Section 296.

201. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A SIXTH CAUSE OF ACTION
## FOR AIDING AND ABETTING UNDER STATE LAW
## (AGAINST ALL DEFENDANTS)

202. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

203. New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

204. Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the unlawful, discriminatory, and retaliatory conduct as stated herein.

205. Plaintiff makes a claim against Defendants under all of the applicable paragraphs of New York State Executive Law Section 296.

206. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A SEVENTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## (AGAINST ALL DEFENDANTS)

207. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

208. The Administrative Code of the Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to

hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

209. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff as set forth herein.

210. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

211. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS AN EIGHTH CAUSE OF ACTION**
**FOR RETALIATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**(AGAINST ALL DEFENDANTS)**

212. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

213. The New York City Administrative Code Title 8, §8-107(1) (e) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . . "

214. Each of the Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, §8-107(1) (e) by discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

215. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York State City Administrative Code Title 8.

216. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A NINTH CAUSE OF ACTION
## FOR AIDING AND ABETTING
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## (AGAINST ALL DEFENDANTS)

217. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

218. The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

219. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling, and coercing the above discriminatory, unlawful, and retaliatory conduct.

220. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

221. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A TENTH CAUSE OF ACTION
## FOR INTERFERENCE UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## (AGAINST ALL DEFENDANTS)

222. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

223. New York City Administrative Code Title 8-107(19) Interference with protected rights states, in relevant part: It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

224. Defendants violated the section cited herein as set forth and Plaintiff suffered numerous damages as a result.

**AS AN ELEVENTH CAUSE OF ACTION**
**FOR EMPLOYER LIABILITY**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**(AGAINST ALL DEFENDANTS)**

225. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

226. New York City Administrative Code Title 8-107(13) entitled Employer liability for discriminatory conduct by employee, agent or independent contractor provides:

    a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

    b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

    i. The employee or agent exercised managerial or supervisory responsibility; or

    ii. The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

    iii. The employer should have known of the employee's or agents discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

227. Defendants violated the section cited herein as set forth and Plaintiff suffered numerous damages as a result.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in an amount which exceeds the jurisdiction of all lower courts for all damages including but not limited to compensatory damages, punitive damages, statutory damages, attorney's fees, costs, interest and all other damages as are just and proper to remedy Defendants' unlawful employment practices.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury as to all issues so triable.

Date:   New York, New York

August 27, 2019

Respectfully Submitted,

**DEREK SMITH LAW GROUP, PLLC**

<u>/s/ Danilo Bandovic</u>
Danilo Bandovic, Esq.
One Penn Plaza, Suite 4905
New York, New York 10119
(212) 587-0760